**LYNCH CARPENTER, LLP**
Todd D. Carpenter (CA 234464)
todd@lcllp.com
Scott G. Braden (CA 305051)
scott@lcllp.com
Alexandra R. Stasio (CA 358410)
alexandras@lcllp.com
9171 Towne Centre Drive, Suite 180
San Diego, California 92122
Telephone:   (619) 762-1910
Facsimile:   (619) 313-1850

*Attorneys for Plaintiff and*
*Proposed Class Counsel*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRISHA TEPERSON, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>JUSTICE BRAND HOLDINGS, LLC, a New York Limited Liability Company, BLUESTAR ALLIANCE LLC, a New York Limited Liability Company,<br><br>Defendants. | Case No.   **'26 CV 2535 WQH DDL**<br><br>**CLASS ACTION COMPLAINT**<br><br>**[DEMAND FOR JURY TRIAL]** |

CLASS ACTION COMPLAINT

Plaintiff Trisha Teperson ("Plaintiff") brings this action, on behalf of herself and all others similarly situated, against Defendants Justice Brand Holdings, LLC ("Justice") and Bluestar Alliance, LLC ("Bluestar") (collectively, "Defendants"), and states:

## I.    NATURE OF THE ACTION

1.    American consumers thrive on finding the best deal. Retailers, including Defendants, are keen to this fact and try to lure consumers to purchase their goods with advertised sales that promise huge savings off the regular price. But the promised savings are false if a retailer simply recasts its regular price as a discount from some higher, fictitious "original" price that no one ever pays. This class action seeks monetary damages, restitution, declaratory and injunctive relief from Defendants arising from their deceptive business practice of advertising fictitious reference prices and corresponding phantom discounts on their e-commerce website shopjustice.com.

2.    The practice of false reference pricing occurs when a retailer fabricates a false "original" price, and then offers an item for sale at a deeply "discounted" price. The result is a sham price disparity that misleads consumers into believing they are receiving a good deal and induces them into making a purchase. In reality, the practice artificially inflates the true market price for these items by raising consumers' internal reference price, and therefore the value, ascribed to these products by consumers. The practice enables retailers, like Defendants, to sell their goods above their true market price. Consumers are damaged by the inflated market price that is established by the false-discounting scheme.

3.    An overview of the illegal scheme and attendant harm is best demonstrated by the following example: Take a retailer who is in the business of selling suits. That retailer knows it can sell a particular suit for $250.00. That $250.00 price represents the "market" price for the suit and the price at which the retailer regularly offers the suit for sale and makes a profit. The retailer then offers the suit on sale. However, instead of discounting the suit from its true original price of $250.00, the retailer utilizes an inflated, "original" price for the suit and lists it at $1,000.00, and then holds it out for sale at 70% off—rendering the "sale" price of the suit $300.00. Consumers who happen upon that purported fake "sale" are

1

CLASS ACTION COMPLAINT

influenced by the amount of the perceived, substantial discount. By presenting the consumer with a false "original" price of $1,000.00, the retailer has increased demand for the suit through the perceived value of both the suit itself and the substantial discount of $700.00. This effect, in turn, impacts the market price of the suit because more consumers are willing to pay $300.00 for a suit they believed was once sold for $1,000.00, when, in fact, the true market price of the suit, without the false discount, was $250.00. If the retailer tried to sell that same suit, for $300.00, without offering the false original price of $1,000.00 and the attendant 70% discount, that retailer would not be able to sell any suits at $300.00 because the true market price of the suit is $250.00. Thus, through the use of a false original price and the corresponding phantom discount of 70% off, the retailer was able to create a false "market" price for the suit—at $300.00. Plaintiff's case seeks that disparity—the impact of the increase in market price from $250.00 to $300.00 through the Defendants' application of an illegal discounting scheme.

4. Retailers, including Defendants, substantially benefit from employing false reference pricing schemes and experience increased sales because consumers use advertised reference prices to make purchase decisions. The information available to consumers varies for different types of products, but consumers frequently lack full information about a product and, as a result, can incorporate information from sellers to make purchase decisions.

5. Through their false and misleading marketing, advertising, and pricing scheme alleged herein, Defendants violated, and continue to violate, California and federal law, which prohibits the advertisement of goods for sale discounted from former prices that are false. California and federal law also prohibit the dissemination of misleading statements about the existence and amount of price reductions. Specifically, Defendants violated, and continue to violate: California's Unfair Competition Law, Business and Professions Code section 17200 *et seq.* (the "UCL"); California's False Advertising Law, Business and Professions Code section 17500 *et seq.* (the "FAL"); and the California Consumer Legal Remedies Act, Civil Code section 1750 *et seq.* (the "CLRA").

6.      Plaintiff brings this action on behalf of herself and other similarly situated consumers who have purchased one or more products from Defendants' e-commerce website shopjustice.com that were deceptively represented as discounted from a false reference price. Plaintiff seeks to halt the dissemination of this false, misleading, and deceptive pricing scheme, to correct the false and misleading perception it has created in the minds of consumers, and to obtain redress for those who have purchased merchandise tainted by this deceptive pricing scheme. Plaintiff also seeks to enjoin Defendants from using false and misleading misrepresentations regarding former price comparisons in their labeling and advertising permanently. Further, Plaintiff seeks to obtain damages, restitution, and other appropriate relief in the amount by which Defendants were unjustly enriched as a result of their sales of merchandise offered at a false discount.

## II.    JURISDICTION AND VENUE

7.      This Court has original jurisdiction of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and at least some members of the proposed Class (defined below) have a different citizenship from Defendants.

8.      This action has a prior federal and state court history and is properly before this Court. Plaintiff originally filed a substantially related class action in the United States District Court for the Central District of California, Case No. 8:23-cv-00281-DOC-DFM, against Nogin, Inc. ("Nogin Inc."), where federal jurisdiction was proper from the outset under CAFA (the "Original Federal Action").

9.      The Original Federal Action was voluntarily dismissed and refiled in the Superior Court of California, County of San Diego, Case No. 37-2023-00041084-CU-NP-NC (the "State Court Action"), for the limited and specific purpose of obtaining judicial approval of an initial class-wide settlement pursuant to the parties' mediated agreement. After that initial settlement did not proceed following Nogin Inc.'s bankruptcy, Plaintiff amended the complaint in the State Court Action to add additional responsible parties, including Defendants. The state court later granted preliminary approval on November 1,

CLASS ACTION COMPLAINT

2024 (ROA No. 81)[1] and final approval on February 21, 2025 (ROA No. 97) of a revised class-wide settlement (the "Settlement"). *See* ROA No. 75.

10.     The Settlement subsequently failed in its entirety, and the State Court Action was never litigated on the merits. With the Settlement void and the Class's underlying claims fully revived, Plaintiff files this action to preserve and prosecute claims against non-debtor Defendants where relief cannot presently be obtained in the stayed State Court Action.

11.     The Southern District of California has personal jurisdiction over Defendants because a substantial part of the events giving rise to Plaintiff's claims arose in this District, and Defendants' misconduct alleged herein occurred in this District. Further, Defendants conduct substantial business in this District and have sufficient minimum contacts in California, and/or otherwise intentionally avail themselves to the California market through the operation of their e-commerce website within the State of California.

12.     Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides in San Diego County, California; Defendants have conducted and continue to conduct business in this District; and a substantial part of the events giving rise to the claims occurred in this District.

### III.     GENERAL ALLEGATIONS

**A.     Retailers Benefit from False Reference Pricing Schemes.**

13.     Defendants engaged in a false and misleading reference price scheme in the marketing and selling of their products on their e-commerce website shopjustice.com.

14.     Retailers substantially benefit from employing false reference pricing schemes, and experience increased sales because consumers use advertised reference prices to make purchase decisions. The information available to consumers varies for different

---

[1] Unless otherwise stated, citations to "ROA No. __" refer to the Register of Actions in the State Court Action.

CLASS ACTION COMPLAINT

types of products.[2] Nonetheless, consumers frequently lack fundamental information about a product and, as a result, often rely on information from sellers to make purchase decisions, especially when a product's value or quality is otherwise difficult to discern.[3]

15. Defendants' deceptively advertised reference prices are thus incorporated into the consumer's decision process. First, a product's "price is also used as an indicator of product quality."[4] In other words, consumers view Defendants' deceptive advertised reference prices as a proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[5] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[6] Under this concept, coined as "transaction utility" by Nobel Prize-winning economist Richard Thaler, consumers place some value on the psychological experience of obtaining a product at a perceived bargain.[7]

---

[2] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (*e.g.*, style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (*e.g.*, longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (*e.g.*, whether the shirt's cotton was produced using organic farming methods). Michael R. Darby & Edi Karni, *Free Competition and the Optimal Amount of Fraud*, 16 J. Law & Econ. 67-, 68–69 (1973).

[3] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Phillip Nelson, *Information and Consumer Behavior*, 78 J.f Pol. Econ. 311, 311–12 (1970).

[4] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 4 J. Pub. Pol'y & Mktg. 52, 54 (1992). *See also* Richard Thaler, *Mental Accounting and Consumer Choice*, 4 Mktg. Sci. 199, 212 (1985) ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[5] Grewal & Compeau, , *supra* note 3, at 52.

[6] Peter Darke & Darren Dahl, *Fairness and Discounts: The Subjective Value of a Bargain*,13 J. Consumer Psych. 328, 328 (2003).

[7] "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of

CLASS ACTION COMPLAINT

16.     Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[8] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience), while external reference prices are "provided by observed stimuli in the purchase environment" (e.g., a "suggested retail price," or other comparative sale price).[9] Researchers report that consumers' internal reference prices adjust toward external reference prices when valuing a product.[10] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[11] In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[12] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[13] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance

the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'".  Thaler, *supra* note 3, at 205.

[8] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Glenn E. Mayhew & Russell S. Winer, *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*,19 J. Consumer Rsch. 62, 68 (1992).

[9] Mayhew & Winer, *supra* note 7, at 62.

[10] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Dhruv Grewal, Kent B. Monroe, & Ramayya Krishnan, *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions*,62 J. Mktg. 46, 48 (1998).

[11] As Thalen notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Thaler, *supra* note 3, at 212.

[12] Dhruv Grewal & Larry D. Compeau, *Pricing and Public Policy: A Research Agenda and An Overview of the Special Issue*, 18 J. Pub. Pol'y & Mktg. 3, 7 (1999).

[13] Gurumurthy Kalyanaram & Russell S. Winer, *Empirical Generalizations from Reference Price Research*,14 Mktg.g Sci. G161, G161 (1995).

CLASS ACTION COMPLAINT

consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][14]

17.    Retailers, including Defendants, understand that consumers are susceptible to a good bargain, and therefore, Defendants have a substantial financial interest in making the consumer believe they are receiving a good bargain, even if they are not. A product's reference price matters to consumers because it serves as a baseline upon which consumers perceive a product's value.

**B.    California State and Federal Pricing Regulations Prohibit False "Original Price" References.**

18.    Under California law, a retailer may only discount an item from its own original price for up to 90 days, or in the alternative, it may offer a discount from the original price of an item being offered by a competitor, within the relevant market, for up to 90 days. In either scenario, a retailer can only offer a "sale" from an original price for 90 days. At that point, on day 91, the retailer has two options: the product must either return to its full original price, or the retailer may continue to sell the product at the discounted price, as long as it discloses to the consumer the date on which the product was last offered for sale at its full retail price. *See* Bus. & Prof. Code, § 17501. Under California law, a retailer cannot use an old, outdated, "original price" as the basis for a sale or discount, unless it discloses to the consumer the date on which the prior original price was offered in the market.

19.    Additionally, under the FTC Guides, when a retailer offers a discount from its own former original price, the original price is required to have been a price at which the retailer held that item out for sale on a regular basis, for a commercially reasonable period of time. *See* 16 C.F.R. § 233.1(a) & (b).

**C.    Defendants' Fraudulent Price Discounting Scheme Violates California State and Federal Regulations.**

20.    Defendants engaged in a false and misleading reference price scheme in the marketing and selling of the products offered on their e-commerce website. Defendants

---

[14] Grewal &Compeau, *supra* note 11, at 7.

CLASS ACTION COMPLAINT

advertised girls' apparel, accessories, and other related items for sale by listing them with a fictitious original price and a corresponding sale price. The original price communicates "the product's worth and the prestige that ownership of the product conveys." *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1106 (9th Cir. 2013). "Misinformation about a product's 'normal' price is...significant to many consumers in the same way as a false product label would be." *Ibid.*

21.    Defendants consistently advertised their products on their e-commerce website shopjustice.com alongside a higher "original" price, and the corresponding sale price. Defendants advertised a seemingly original price, in truth a false reference price, with a "strikethrough," which suggests to customers that Defendants previously offered their products at the strikethrough price. The false reference price operates as a baseline consumers rely on to assess a product's value. Moreover, it is shown next to the "sale" price to communicate to consumers that Defendants are selling a product at a substantial discount, even though the product is not in fact discounted. The sale price displayed directly next to the false reference price conveys the "deep discount" at which Defendants presently offer a product, ostensibly for a limited time.

22.    However, the products sold on Defendants' e-commerce website were never sold at the price consumers are led to presume is the full original price—the price displayed with a strikethrough next to the "sale" price. The "deep discount" of products communicated to consumers viewing Defendants' e-commerce website constitutes a misrepresentation by Defendants. The "original" price communicated by Defendants merely serves as a false reference price Defendants use as part of a larger scheme to deceptively manufacture false discounts to incentivize consumers to make purchases.

23.    Defendants' purposeful practice operates by deceiving consumers into (1) making purchases they otherwise would not have made and (2) paying substantially more for products they believed are heavily discounted and thus worth more than their actual value. The only plausible explanation for Defendants' above illustrated practice is to drive sales, artificially inflate the perceived value of their products, and, as a result, artificially

CLASS ACTION COMPLAINT

inflate the price at which consumers are willing to buy their products. Defendants have, and without intervention will continue to, increase sales by creating the illusion of short-lived bargains by purporting to offer products on sale from false original prices.

24. Defendants' perpetual listings of their products as discounted on their e-commerce website shopjustice.com constituted false, fraudulent, and deceptive advertising because the advertised reference prices the website displayed listed substantially higher prices than those ever offered by Defendants. The communicated reference prices only served to deceive consumers; they functioned as benchmark prices from which the false discount and corresponding "sale" price were derived. Defendants' scheme tricked consumers into justifiably believing they were getting a significant deal when in reality consumers were paying the usual retail price for products.

25. In sum, the false reference prices, the strikethrough of said prices, and the sale prices displayed next to each other on product listing pages on Defendants' e-commerce website shopjustice.com were all part of Defendants' purposeful, deceptive scheme. The products sold through Defendants' e-commerce website shopjustice.com were never offered for sale, nor sold, at the advertised false reference price. Defendants advertised false reference prices with the purpose of inducing consumers into believing their products were once sold at said price. The strikethrough of the false reference prices next to products created a false sense of urgency in consumers. Defendants intended for consumers to be misled that Defendants would sell their products at the advertised, higher reference price "again" if they did not purchase their products soon; and consumers were misled. Consumers believed they were receiving a substantial bargain when they purchased products on Defendants' e-commerce website at the "discounted" sale price. However, Defendants did not actually sell products on their e-commerce website shopjustice.com at the advertised reference prices within 90 days of discounting them. In fact, Defendants never offered or sold products at their advertised false reference price, and consumers thus never received a true bargain. All while fully aware of their deception, Defendants have achieved their ultimate, continuing purpose of driving sales with sham markdowns.

CLASS ACTION COMPLAINT

26. Nowhere on Defendants' e-commerce website did Defendants disclose that the reference or "original" prices are not: former prices; or recent, within 90 days, regularly offered former prices; or prices at which identical products are sold elsewhere in the market. The omission of these disclosures, coupled with Defendants' use of fictitious advertised reference prices, renders Defendants' pricing scheme inherently misleading.

27. Moreover, the advertised discounts were fictitious because the reference prices did not represent a bona fide price at which Defendants previously sold or offered to sell the products, on a regular basis, for a commercially reasonable period of time, as required by the Federal Trade Commission ("FTC"). In addition, the represented advertised reference prices were not the prevailing market retail price within the three months (90 days) immediately preceding the publication of the advertised former reference price, as required by California law.

28. Thus, Defendants' scheme intended to, and did, provide misinformation to the customer. This misinformation communicated to consumers, including Plaintiff, that the products sold on Defendants' e-commerce website had greater value than the advertised discounted price.

29. The reference prices listed and advertised on products sold through Defendants' e-commerce website were false or severely outdated reference prices, utilized only to perpetuate Defendants' false discount scheme.

30. Defendants knew that their reference price advertising was false, deceptive, misleading, and unlawful under state and federal law.

31. Defendants fraudulently concealed from, and intentionally failed to disclose to, Plaintiff and other members of the Class, the truth about their advertised discount prices and former reference prices.

32. At all relevant times, Defendants have been under a duty to Plaintiff and the Class to disclose the truth about their false discounts.

33. Upon information and belief, the shopjustice.com website has ceased active retail operations and now redirects visitors to a third-party retail platform. The claims

10

CLASS ACTION COMPLAINT

alleged herein arise from Defendants' false reference pricing practices during the period in which the shopjustice.com website was operational and products were offered for sale to consumers, including Plaintiff.

### D. Plaintiff's Counsel's Investigation

34. Products sold on Defendants' website, shopjustice.com, were priced uniformly. In other words, the products sold by Defendants bore a substantially discounted sale price that appeared next to the "crossed out" or "strikethrough" original price. Plaintiff's counsel's investigation confirmed that the merchandise purchased by Plaintiff was priced with a false reference price and a corresponding discounted price for at least the 90-day period immediately preceding Plaintiff's purchase in violation of California law. The product purchased by Plaintiff was not, at the time of Plaintiff's purchase and Plaintiff's counsel's investigation, offered for sale in any other market.

35. Plaintiff's counsel conducted a thorough investigation of Defendants' website. Plaintiff's counsel deployed a sophisticated software program to track each item offered for sale on the shopjustice.com website. Plaintiff's counsel tracked the pricing of certain merchandise offered for sale through shopjustice.com for various periods from 2022 through 2023. A sample of the items tracked are attached as Exhibit A. For the duration of the tracking period, each product remained significantly discounted from its reference price. Plaintiff's counsel's investigation revealed that approximately 680 items on shopjustice.com were on sale for more than 100 days as of, on or around, July 30, 2022. The investigation indicated the false reference pricing scheme was uniform across Defendants' e-commerce website.

36. Plaintiff's claims are limited to the period during which products were offered for sale through the shopjustice.com website as an independent e-commerce retail website operated for the Justice brand. Plaintiff is informed and believes that shopjustice.com later ceased operating as an independent retail website and currently redirects visitors to Walmart.com listings for Justice-branded products. Plaintiff does not assert claims in this action based on any current Walmart.com listings, pricing, advertising, or retail activity.

37. The false reference price and corresponding discount price scheme were both uniform and identical on all products sold through Defendants' e-commerce website.

38. Thus, the fraudulent price scheme applied to all products offered for sale through Defendants' e-commerce website, including the product purchased by Plaintiff.

## IV. THE PRIOR SETTLEMENT HISTORY, NOGIN COMMERCE BANKRUPTCY AND COLLAPSE OF THE SETTLEMENT

39. On February 16, 2023, Plaintiff filed the Original Federal Action against Nogin, Inc. arising from the false reference pricing scheme described herein.

40. The parties to the Original Federal Action participated in a full-day mediation before the Hon. Edward A. Infante (Ret.) of JAMS and reached an initial class-wide settlement. In connection with the initial settlement, the Original Federal Action was voluntarily dismissed and refiled as the State Court Action, for the purpose of obtaining judicial approval of the settlement pursuant to the parties' mediated agreement. ROA No. 1. That initial settlement never fully materialized after Nogin filed for bankruptcy while the parties were negotiating the long-form agreement.

41. Even before the mediation, Nogin's precarious financial condition had become apparent. Nogin's auditors had issued a "going concern" notice, and Nogin's SEC filings disclosed agreements with B. Riley Securities, Inc. and B. Riley Principal Investments, LLC for the acquisition of 100% of Nogin. Those same filings acknowledged that Nogin intended to file a voluntary bankruptcy petition no later than December 1, 2023. ROA No. 10.

42. Plaintiff filed a First Amended Complaint in the State Court Action adding Justice Brand Holdings, LLC, Bluestar Alliance, LLC, B. Riley Securities, Inc., and B. Riley Principal Investments, LLC as Defendants following Nogin Inc.'s bankruptcy filing. ROA No. 49.

43. During renewed settlement negotiations in the State Court Action, the Settlement was ultimately structured so that Nogin Commerce, LLC—a post-bankruptcy successor entity that was never a party to the action—would be the sole entity responsible for all settlement obligations, including funding the class relief and administering the

12

CLASS ACTION COMPLAINT

Settlement. Neither Bluestar Alliance, Justice Brand Holdings, nor any other Defendant assumed any direct financial obligation to the Class under the Settlement Agreement. [SA §§ 1.23, 4.1, 6.1.]

44.    On or about February 21, 2025, the Court in the State Court Action granted final approval of the class-wide Settlement. ROA No. 97. Under the terms of the Settlement, Nogin Commerce was designated to fund and administer the Settlement relief owed to the Class, including: (a) $12.50 merchandise certificates to each of approximately 591,278 class members who received email notice (representing an estimated $7,390,975 in total class relief); (b) all notice and administration costs; and (c) $600,000 in attorneys' fees and costs payable in three installments. SA §§ 1.21, 2.2–2.4, 2.7–2.8, 5.2. Defendants Bluestar Alliance LLC and Justice Brand Holdings LLC did not assume direct, joint responsibility for funding the Settlement.

45.    During the renewed settlement negotiations that followed Nogin's first bankruptcy, Defendants and their counsel presented Nogin Commerce as a viable, performing entity and insisted it be solely responsible for Settlement performance. When Plaintiff's Counsel expressed concern about the viability of such a structure, Defendants and their counsel represented that Nogin Commerce could perform the Settlement obligations and that the proposed structure was workable.

46.    In reality, Defendants knew or should have known that Nogin Commerce was financially unstable and at risk of insolvency at the time the Settlement was negotiated. Nogin's predecessor had already undergone a Chapter 11 bankruptcy in Delaware (Case No. 23-11945 (CTG)), and its auditors had issued a "going concern" notice as early as the beginning of 2023. ROA No. 10. B. Riley Securities, Inc. and B. Riley Principal Investments, LLC—entities whose in-house counsel, Rebecca Hollander, was actively involved in the Settlement negotiations—had financed the acquisition of Nogin's reorganized equity and were intimately familiar with its precarious financial condition.

47.    Michael Bassiri—who served as counsel for both Nogin and Nogin Commerce during the Settlement negotiations—participated in negotiating the Settlement agreement

CLASS ACTION COMPLAINT

without disclosing facts suggesting that Nogin Commerce was under severe financial distress or at substantial risk of being unable to perform its obligations. At the time the Settlement was negotiated and presented for court approval, neither Bassiri nor the defense team disclosed that Nogin Commerce's financial condition placed Settlement performance at serious risk.

48.    Defendants' knowledge of Nogin Commerce's financial instability is further demonstrated by the speed of its collapse. On March 26, 2025—barely one month after the Court in the State Court Action granted final approval of the Settlement on February 21, 2025—Nogin Commerce executed a General Assignment for the Benefit of Creditors in favor of Anthony Sodono, III, who assumed control of its assets. *See In re Nogin Commerce, LLC*, Case No. 1:25-BK-10810 (MG), Dkt. No. 6, Ex. B (Bankr. S.D.N.Y.). This formal liquidation proceeding occurred shortly after final approval, before the Settlement had been performed, and without any meaningful disclosure to Plaintiff, the Class, or the Court regarding whether and how the Settlement obligations could be fulfilled.

49.    On April 24, 2025—just two months after final approval—four creditors filed an involuntary Chapter 7 petition against Nogin Commerce in the United States Bankruptcy Court for the Southern District of New York, Case No. 1:25-BK-10810 (MG) (the "Nogin Commerce Bankruptcy"), alleging over $3.33 million in unpaid liabilities and the diversion of millions of dollars in supplier funds. *See* Nogin Commerce Bankruptcy, Dkt. No. 1. The Bankruptcy Court denied Nogin Commerce's motion to dismiss, finding the petition properly filed and the interests of over 100 creditors requiring federal bankruptcy protections. *See id.*, Dkt. No. 24.

50.    After learning of Nogin Commerce's collapse, Plaintiff's Counsel contacted Bassiri to obtain a replacement contact for Settlement administration. After several evasive exchanges in which Bassiri declined to identify any replacement, Plaintiff's Counsel warned that the sequence of events raised serious concerns regarding the Settlement's viability and the circumstances under which it had been approved. Bassiri responded with an obscene and threatening text message, confirming his unwillingness to cooperate or provide any path

CLASS ACTION COMPLAINT

forward for the Class. *See* ROA No. 101, at 6. None of the named Defendants—Justice Brand Holdings, Bluestar Alliance, or the B. Riley entities—took any steps to fulfill Nogin Commerce's obligations following its collapse.

51.     During Settlement negotiations and drafting, Defendants and their counsel—particularly the B. Riley Defendants—expended considerable effort to control the contents of proposed filings, objecting to any language that could portray Defendants in a negative light. This pattern is consistent with Defendants' effort to minimize public discussion of Nogin Commerce's financial condition and the risks associated with placing all Settlement performance obligations on that entity.

52.     The absence of disclosure regarding Nogin Commerce's financial instability deprived Plaintiff, the Class, and the Court of material information necessary to evaluate the Settlement's fairness and adequacy. The Settlement's foundation—the premise that Nogin Commerce would fund merchandise certificates, administration costs, and attorneys' fees—proved unviable. The Class was bound to a release in exchange for consideration that was never delivered.

53.     Not surprisingly, then, the Settlement has failed in its entirety. The promised consideration has not been delivered to the Class. No merchandise certificates have been distributed. No attorneys' fees have been paid. Even the Settlement administrator, Analytics Consulting, LLC, remains unpaid, with approximately $20,000 in outstanding fees. The Class has received no meaningful relief of any kind.

54.     The involuntary petition in the Nogin Commerce Bankruptcy was filed by four creditors who alleged, among other things, that Nogin Commerce had diverted millions of dollars in funds held for the benefit of its suppliers and creditors in the weeks before ceasing operations. *See* Nogin Commerce Bankruptcy, Dkt. No. 24, at 9–10 (Memorandum Opinion and Order of Chief Judge Martin Glenn).

55.     On June 11, 2025, Chief Judge Glenn denied a motion to dismiss the involuntary petition, finding that the interests of Nogin Commerce's creditors—numbering over 100, including international entities—required the protections of federal bankruptcy

15

CLASS ACTION COMPLAINT

proceedings. The Court found that there were "competing interests between numerous creditors," that there was a "clear risk of loss or dissipation of assets," and that the bankruptcy proceeding could "better serve the interests of both creditors and the Alleged Debtor." *Id.* at 26, 30–31.

56. On June 13, 2025, the bankruptcy court entered an Order for Relief, placing Nogin Commerce into involuntary Chapter 7 liquidation. The case is designated "No Asset" on the bankruptcy docket. *See* Nogin Commerce Bankruptcy, Dkt. No. 25.

57. At the time of the assignment for the benefit of creditors that preceded the involuntary petition, Nogin Commerce had approximately $650,000 in cash on hand and owed secured debt to CPH Capital Fund I, L.P. ("CPH") in excess of $17 million—an amount the assignee acknowledged exceeded the value of all of Nogin Commerce's assets. *Id.* at 4.

58. On October 21, 2025, the Chapter 7 Trustee filed Notices of Abandonment of the estate's interest in Bicoastal Alliance LLC and inventory located in Ambridge, Pennsylvania, reflecting their lack of value to the estate beyond the secured creditor's interest. *See* Nogin Commerce Bankruptcy, Dkt. Nos. 57, 58.

59. On November 11, 2025, the Trustee moved for approval of the sale of substantially all of Nogin Commerce's remaining assets—its intellectual property platform, registered intellectual property, and related contracts—to Cart.com, Inc. The total purchase price consisted of $250,000 in cash to the estate and 55,237 shares of Cart.com stock with an attributed value of $1,425,000, which were transferred directly to CPH in partial satisfaction of its secured claim. *See* Nogin Commerce Bankruptcy, Dkt. No. 65, at 5. The Trustee described this as "the most viable option" for the estate. *Id.* at 6.

60. The Trustee also resolved CPH's claim to the approximately $679,583 in estate funds turned over by the assignee, paying CPH $200,000 and retaining approximately $479,000 for the estate. *Id.* at 12. After the asset sale and resolution of CHP's claim, CPH retained an allowed secured claim of $15,141,987.42 and its related entity, Beyond CPH

Acquisition SPV LLC, retained an allowed general unsecured claim of $3,850,000. *See* Nogin Commerce Bankruptcy, Dkt. No. 68, at 7.

61.    On December 3, 2025, Chief Judge Glenn approved the asset sale and the resolution of CPH's claim, finding them to be "fair, reasonable, and in the best interest of the Debtor's estate," and waived the 14-day stay period to permit immediate closing. No objections were filed. *Id.* at 3, 9.

62.    As of the date of this Complaint, the 341(a) meeting of creditors in the Nogin Commerce Bankruptcy has been continued seven consecutive times, most recently to April 17, 2026. No distribution to unsecured creditors has been made or noticed, and none is anticipated. The estate holds approximately $729,000 in total funds against over $19 million in allowed secured and unsecured claims held by CPH entities alone—before accounting for the claims of over 100 additional creditors, including the Settlement class in the State Court Action.

63.    Nogin Commerce, LLC is, for all practical purposes, a defunct entity in the final stages of a no-asset Chapter 7 liquidation. There is no realistic prospect that the Settlement class will recover any portion of the relief promised under the failed Settlement through the Nogin Commerce Bankruptcy.

64.    The failure of the Settlement constitutes a failure of consideration. The Class and Plaintiff have not received the benefit of the bargain underlying the Settlement agreement or the corresponding release of claims. The non-performance of the Settlement obligations renders any purported release of claims void, unenforceable, or subject to rescission under applicable law.

65.    The foregoing facts also support Plaintiff's position that the Settlement was secured by Defendants, and subsequently approved by the Court, based on material nondisclosure and misleading assurances regarding Nogin Commerce's ability to perform. At minimum, those circumstances further confirm that the release cannot equitably be enforced against Plaintiff or the Class after the promised consideration wholly failed.

CLASS ACTION COMPLAINT

66. Defendants were aware, or should have been aware, of the financial instability of Nogin Commerce at the time the Settlement was structured, yet proceeded to insulate themselves from direct liability while exposing the Class to the risk of non-performance. Defendants structured the Settlement to rely on Nogin Commerce for performance while disclaiming direct responsibility for funding.

67. Defendants obtained the benefit of a class-wide release—including delay, litigation avoidance, and purported claim extinguishment—without the Class receiving any consideration in return. As a result, Plaintiff and the Class remain entitled to pursue their underlying claims, as well as additional remedies arising from Defendants' role in structuring and benefiting from a failed and unperformed Settlement.

## V.    PARTIES

### A.    Plaintiff

68. Plaintiff Trisha Teperson resides in San Diego County, California. Plaintiff, in reliance on Defendants' false and deceptive advertising, marketing and discounting pricing schemes, purchased the following item online from San Diego County, California on September 14, 2022:

| Item: | Quantity: | "Sale" Price Paid by Plaintiff: | False Reference Price from which the "Discount" was applied: |
|---|---|---|---|
| Patterned Short Pajama Set | 1 | $26.99 | $46.00 |

69. Plaintiff examined the above-listed product on Defendants' website before deciding to purchase it after reviewing the item's advertised sale price. The item Plaintiff purchased was advertised as having an original price that was more than the sale price displayed on the website. Defendants advertised the item as having a sale price at a discount.

70. After observing the original price of the "Patterned Shorts Pajama Set" with a strikethrough, and the accompanying sale price itself, Plaintiff believed she was receiving

18

CLASS ACTION COMPLAINT

a significant discount on the product she had chosen. Because she was interested in the product and felt that the discounted price would likely not last, and that she was getting a significant bargain on the product, Plaintiff proceeded to finish checking out and purchased it.

71.    However, this product was never offered for sale at the original price communicated on Defendants' e-commerce website and certainly not within the 90 days preceding Plaintiff's purchase. Neither Plaintiff's receipt nor any other language on the website observed or relied upon by Plaintiff indicated that the product was not offered previously at the reference price.

72.    Plaintiff reasonably relied upon Defendants' artificially inflated reference prices and false discounts when purchasing the aforementioned product from Defendants' e-commerce website. Plaintiff would not have made such a purchase but for Defendants' representations regarding the substantial discount being offered for the product. Plaintiff would like to continue buying from Defendants' e-commerce website in the future but cannot be certain of the veracity of Defendants' advertised bargains.

73.    Plaintiff and the Class reasonably and justifiably acted and relied on the substantial price differences that Defendants advertised, and they made purchases believing they were receiving a substantial discount on a product of greater value than the value it had in actuality. Plaintiff, like other Class members, was lured in, relied on, and was damaged by the deceptive pricing scheme Defendants carried out.

74.    Plaintiff was damaged in her purchase because Defendants' false reference price discounting scheme inflated the true market value of the item she purchased. Plaintiff is susceptible to this reoccurring harm because she cannot be certain that Defendants have corrected this deceptive pricing scheme and she desires to shop at Defendants' website in the future. However, she currently cannot trust that Defendants will accurately price their products truthfully and in a non-misleading fashion in compliance with applicable law.

75.    Plaintiff lacks an adequate remedy at law with respect to her claim for equitable restitution because she has not yet retained an expert to determine whether an

19

CLASS ACTION COMPLAINT

award of damages can or will adequately remedy her monetary losses caused by Defendants. Particularly, as legal damages focus on remedying the loss to the plaintiff and equitable restitution focuses wholly distinctly on restoring monies wrongly acquired by the defendants, legal damages are inadequate to remedy Plaintiff's losses because Plaintiff does not know at this juncture, and is certainly not required to set forth evidence, whether a model for legal damages (as opposed to equitable restitution) will be viable or will adequately compensate Plaintiff's losses.

76. Plaintiff's case is substantially predicated on Defendants' violation of Business and Professions Code section 17501, an equitable claim, as Plaintiff's counsel's investigation revolved around ensuring that Defendants did not sell products at the indicated reference price within the 90 days preceding Plaintiff's purchase and, likewise, that Defendants failed to disclose to consumers the date on which products were last offered at their advertised reference price. This claim and test of liability go to the heart of Plaintiff's case and the same test is not available under a CLRA legal claim for damages. Thus, Plaintiff does not have an adequate remedy at law because the CLRA does not provide the same metric of liability as Business and Professions Code section 17501, which is integral not only to Plaintiff's prayer for restitution, but also to Plaintiff's very theory of liability at trial.

**B. Defendants**

77. Defendant Bluestar Alliance, LLC is a New York Limited Liability Company with its principal executive offices in New York, New York. Plaintiff is informed and believes that Defendant fully owns Justice Brand Holdings, LLC, which in turn fully owns the Justice brand and shopjustice.com. Defendant Bluestar Alliance, LLC purchased Justice Brand Holdings LLC from Ascena Retail Group in November of 2020. Justice is listed as one of Bluestar Alliance, LLC's "Brands" on its website. Bluestar Alliance acquired the intellectual property of the Justice Brand through a newly established entity, Defendant Justice Brand Holdings, LLC.

CLASS ACTION COMPLAINT

78.    Defendant Justice Brand Holdings, LLC is a New York Limited Liability Company with its principal executive offices in New York, New York. Plaintiff is informed and believes that Defendant Justice Brand Holdings, LLC fully owns the Justice brand; and, in turn, Defendant Bluestar Alliance, LLC fully owns Defendant Justice Brand Holdings, LLC. On shopjustice.com, the bottom of the webpage stated that "[t]he JUSTICE® trademarks, name and logos are owned by Justice Brand Holdings LLC." In addition, the website justiceretail.com also stated that "Justice is now owned and operated by Justice Brand Holdings LLC." Thus, Plaintiff is informed and believes that Defendant Justice Brand Holdings, LLC operated the shopjustice.com website, and advertised, marketed, distributed, and/or sold girls' apparel and accessories in California and throughout the United States.

79.    Non-party Nogin, Inc. ("Nogin") was incorporated in Delaware with its principal executive offices in Tustin, California. Nogin provided operational support for the shopjustice.com website, and advertised, marketed, distributed, and/or sold girls' apparel and accessories in California and throughout the United States on behalf of Defendants. In a May 2023 investor presentation, shopjustice (under the brand name Justice) was listed as one of "Nogin's valued customers." It was reported in July of 2021 that Justice moved its online store to Nogin's "platform." Nogin is now defunct and its successor, Nogin Commerce, LLC, is in Chapter 7 bankruptcy as detailed herein.

## VI.    CLASS ALLEGATIONS

80.    Plaintiff brings this action on behalf of herself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendants:

> All persons who, within the applicable statutory period (the "Class Period"), purchased from Defendants' e-commerce website shopjustice.com one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

21

CLASS ACTION COMPLAINT

81.    Excluded from the Class are Defendants, as well as their officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiff reserves the right to expand, limit, modify, or amend this Class definition, including the addition of one or more subclasses, in connection with her motion for Class certification, or at any other time, based upon, inter alia, changing circumstances and/or new facts obtained during discovery.

82.    *Numerosity*: The Class members are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that the proposed Class contains hundreds of thousands of individuals who have been damaged by Defendants' conduct as alleged herein. The precise number of Class members is unknown to Plaintiff.

83.    ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following: whether, during the Class Period, Defendants used falsely advertised reference prices on their products sold through their e-commerce store; whether the reference prices advertised by Defendants were the prevailing market prices for the products in question during the three-month period preceding the dissemination and/or publication of the advertised former prices; whether Defendants' alleged conduct constitutes violations of the laws asserted; whether Defendants engaged in unfair, unlawful and/or fraudulent business practices; whether Defendants engaged in false or misleading advertising; whether Plaintiff and Class members are entitled to damages and/or restitution and the proper measure of that loss; whether an injunction is necessary to prevent Defendants from continuing to use false, misleading or illegal price comparisons; and whether Plaintiff and the Class are entitled to an award of reasonable attorneys' fees, interest, and costs of suit.

84.    *Typicality*: Plaintiff's claims are typical of the claims of the Class members because, inter alia, all Class members have been deceived (or were likely to be deceived)

CLASS ACTION COMPLAINT

by Defendants' false and deceptive price advertising scheme, as alleged herein. Plaintiff is advancing the same claims and legal theories on behalf of herself and all Class members.

85. *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interest to those of the Class.

86. *Superiority*: The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to her and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages, restitution, or injunctive relief and Defendants will be permitted to retain the proceeds of their fraudulent and deceptive misdeeds.

87. All Class members, including Plaintiff, were exposed to one or more of Defendants' misrepresentations or omissions of material fact claiming that former reference prices and advertised prices were legitimate. Due to the scope and extent of Defendants' consistent false sale prices and advertising scheme, disseminated in a years-long campaign to California consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Class.

88. Plaintiff is informed that Defendants keep extensive computerized records through their online sales data. Defendants have one or more databases through which a significant majority of Class members may be identified and ascertained, and they maintain contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

23

CLASS ACTION COMPLAINT

## VII.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Violation of California's Unfair Competition Law ("UCL") Business and Professions Code section 17200 et seq.**

89.   Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

90.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants for violations of the UCL, Business and Professions Code section 17200 et seq.

91.   The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Bus. & Prof. Code, § 17200. The UCL imposes strict liability. *See Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 181 (Cal. 2000).

**"Unfair" Prong**

92.   A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

93.   Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants engaged in misleading and deceptive price comparison advertising that represented false reference prices and corresponding deeply discounted phantom "sale" prices.

94.   The harm to Plaintiff and Class members outweighs the utility of Defendants' practices. There were reasonably available alternatives to further Defendants' legitimate business interests other than the misleading and deceptive conduct described herein.

**"Fraudulent" Prong**

95.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

96.    Defendants' acts and practices alleged above constitute fraudulent business acts or practices, as they deceived Plaintiff and are highly likely to deceive members of the consuming public. Plaintiff relied on Defendants' fraudulent and deceptive representations regarding their false reference prices and corresponding phantom discounts on products sold at Defendants' e-commerce website shopjustice.com.

**"Unlawful" Prong**

97.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation. Defendants' acts and practices alleged above constitute unlawful business acts or practices as they have violated state and federal law in connection with their deceptive pricing scheme.

98.    Defendants' practices, as set forth above, have misled Plaintiff, the proposed Class, and the public in the past, and will continue to mislead in the future. Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

99.    Pursuant to the UCL, Plaintiff is entitled to preliminary and permanent injunctive relief and an order for Defendants to cease this unfair competition, as well as disgorgement and restitution to Plaintiff and the Class of all Defendants' revenues associated with their unfair competition, or such portion of those revenues as the Court may find equitable.

**SECOND CAUSE OF ACTION**

**Violation of California's False Advertising Law ("FAL") Business and Professions Code section 17500 et seq.**

100.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

101.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants for violations of the FAL, Business and Professions Code section 17500 *et seq.*

25

CLASS ACTION COMPLAINT

102.   Defendants' routine of advertising discounted prices from false "reference" prices, which were never the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendants' actual sale price), was an unfair, untrue, and misleading practice. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were, therefore, leading to the false impression that the products sold on Defendants' e-commerce website were worth more than they actually were.

103.   Defendants misled consumers by making untrue and misleading statements and failing to disclose what is required by the Code, as alleged above.

104.   As a direct and proximate result of Defendants' misleading and false advertisements, Plaintiff and Class members have suffered injury in fact and have lost money. Plaintiff requests that this Court order Defendants to restore this money to Plaintiff and all Class members, and to enjoin Defendants from continuing these unfair practices.

## THIRD CAUSE OF ACTION

**Violation of California's Consumer Legal Remedies Act ("CLRA") Civil Code section 1750 et seq.**

105.   Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

106.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants for violations of the CLRA, Cal. Civ. Code section 1750, *et seq.*

107.   This cause of action is brought pursuant to the CLRA, Civil Code section 1750 et seq. Plaintiff and each member of the proposed Class are "consumers" as defined by Civil Code section 1761, subdivision (d). Defendants' sale of merchandise on their e-commerce website to Plaintiff and the Class were "transactions" within the meaning of Civil Code section 1761, subdivision (e). The products purchased by Plaintiff and the Class are "goods" within the meaning of Civil Code section 1761, subdivision (a).

26
CLASS ACTION COMPLAINT

108. Defendants violated, and continue to violate, the CLRA by engaging in the following practices proscribed by Civil Code section 1770, subdivision (a), in transactions with Plaintiff and the Class: (13) Making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions.

109. Concurrently with the filing of this Complaint, Plaintiff's counsel is providing written notice to Defendants Bluestar Alliance, LLC and Justice Brand Holdings, LLC, pursuant to section 1782, subdivision (a) of the CLRA, of the particular violations of section 1770 alleged herein.[15] If these Defendants fail to rectify the identified violations within 30 days, Plaintiff will amend this Complaint to add claims for actual, punitive, and statutory damages. As to these Defendants, Plaintiff presently seeks only equitable relief under the CLRA.

## FOURTH CAUSE OF ACTION
### Rescission / Failure of Consideration

110. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

111. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants for rescission of the class-wide Settlement agreement and related relief based on failure of consideration.

112. Defendants entered into a class-wide Settlement agreement with Plaintiff and the Class, which was preliminarily and finally approved by the Court. Under the terms of that agreement, Defendants were obligated to provide consideration in exchange for a complete release of claims.

113. The Settlement was structured at Defendants' insistence such that a non-party entity, Nogin Commerce, was designated as the entity responsible for funding and administering the Settlement. Defendants declined to assume joint or direct obligations to

---

[15] Plaintiff previously sent CLRA notice to Defendants Bluestar Alliance LLC and Justice Brand Holdings, LLC on December 8, 2023, in connection with the State Court Action. Out of an abundance of caution, Plaintiff is resending the notice letters concurrently with the filing of this Complaint.

CLASS ACTION COMPLAINT

ensure performance and specifically structured the agreement to disclaim direct responsibility for funding.

114. Following final court approval, the Settlement wholly failed. The promised consideration was never delivered to the Class, and the Settlement administrator has not been fully compensated for its services. The failure of performance was caused by the financial collapse and bankruptcy filing of the designated third-party funding entity.

115. The non-delivery of consideration constitutes a total failure of consideration under applicable law. Because the Class received no benefit under the Settlement agreement, the agreement and release of claims executed thereunder lack the consideration required to be enforceable.

116. A contract may be rescinded where there is a failure of consideration or where the consideration bargained for wholly fails to materialize. The Class's obligation to release its claims was conditioned upon receipt of the Settlement consideration. That condition was not satisfied. The agreement must be rescinded to restore Plaintiff and the Class to their pre-Settlement positions.

117. Plaintiff, on behalf of herself and the Class, seeks rescission of the Settlement agreement, a declaration that the class-wide release is void and unenforceable, and restoration of all parties to their pre-Settlement positions so that Plaintiff and the Class may pursue their underlying claims.

### FIFTH CAUSE OF ACTION
**Unjust Enrichment**

118. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

119. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants for unjust enrichment and related restitutionary relief.

120. Defendants have been unjustly enriched at the expense of Plaintiff and the Class through Defendants' structuring of and conduct in connection with the class

CLASS ACTION COMPLAINT

Settlement, by which Defendants obtained and retained the benefit of a class-wide release of claims without delivering the promised consideration.

121. Defendants received and retained the benefit of a full class-wide release of all claims—including the underlying pricing claims—while engineering a Settlement structure that ensured they would face no direct financial liability. Defendants designated an undercapitalized and financially unstable third party to fund the Settlement while retaining the class-wide release, thus obtaining something of substantial value for nothing.

122. It would be inequitable for Defendants to retain this benefit under the circumstances. No legal remedy exists that would fully and adequately disgorge the benefits Defendants have retained, making equitable relief appropriate.

123. Plaintiff and the Class are entitled to restitution and disgorgement of all amounts by which Defendants have been unjustly enriched, including the value of the class-wide release that Defendants obtained without delivering the corresponding consideration.

## SIXTH CAUSE OF ACTION
### Declaratory Relief

124. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

125. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants for declaratory relief concerning the validity and enforceability of the class-wide Settlement agreement and release, and the continued viability of Plaintiff's and the Class's underlying claims.

126. An actual controversy exists between Plaintiff and Defendants regarding whether the class-wide Settlement agreement and the release executed in connection therewith remain valid and enforceable in light of the complete failure of the Settlement consideration.

127. Plaintiff contends that the Settlement agreement is void, rescinded, or otherwise unenforceable due to the total failure of consideration, and that the Class's

29
CLASS ACTION COMPLAINT

underlying claims—including claims under the UCL, FAL, and CLRA—remain fully viable and may be prosecuted against Defendants.

128.   Defendants have taken the position, and upon information and belief continue to maintain, that the Settlement release bars Plaintiff's and the Class's claims.

129.   Plaintiff seeks a judicial declaration that: (a) the class-wide Settlement agreement is void or has been rescinded for failure of consideration; (b) the release of claims executed in connection with the Settlement is unenforceable; and (c) Plaintiff and the Class retain all rights to prosecute their underlying claims against Defendants.

130.   A judicial declaration is necessary and appropriate at this time so that the parties may ascertain their rights and obligations with respect to the failed Settlement and the viability of the underlying claims.

## VIII.    PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself and on behalf of the other members of the Class, requests that this Court award relief against Defendants as follows:

a.    an order certifying the Class and designating Plaintiff as the Class Representative and her counsel as Class Counsel;

b.    awarding Plaintiff and Class members actual, consequential, punitive and statutory damages, as appropriate;

c.    awarding restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiff and the Class members as a result of their unlawful, unfair, and fraudulent business practices described herein;

d.    rescission of the class Settlement agreement and a declaration that the class-wide release is void and unenforceable for failure of consideration, with restoration of the parties to their pre-Settlement positions;

e.    awarding declaratory and injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, ordering Defendants to engage in a corrective disclosure campaign, and directing

CLASS ACTION COMPLAINT

Defendants to identify, with Court supervision, victims of their misconduct and pay them all money they are required to pay;

        f.    awarding attorneys' fees and costs; and

        g.    for such other and further relief as the Court may deem necessary or appropriate.

## IX.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all of the claims so triable.

Dated: April 21, 2026

LYNCH CARPENTER, LLP

By:  */s/ Scott G. Braden*
Scott G. Braden (CA 305051)
scott@lcllp.com
Todd D. Carpenter (CA 234464)
todd@lcllp.com
Alexandra R. Stasio (CA 358410)
alexandras@lcllp.com
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
Telephone:  (619) 762-1910
Facsimile:  (619) 313-1850

*Attorneys for Plaintiff*
*and Proposed Class Counsel*

31
CLASS ACTION COMPLAINT